**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| LTL MANAGEMENT LLC, | DOCKET NO.: 3:23-CV-03649-MAS-RLS |
|     Plaintiff, | CIVIL ACTION |
|     v. | **MEMORANDUM IN SUPPORT OF MOTION TO DISMISS** |
| DR. THERESA SWAIN EMORY, DR. RICHARD LAWRENCE KRADIN, AND DR. JOHN COULTER MADDOX, | **Motion Date: October 16, 2023** |
|     Defendants. | **ORAL ARGUMENT REQUESTED** |

<u>**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**</u>

3415324.1

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................1

BACKGROUND ..................................................................................................2

    A.     Johnson & Johnson's Talc-Related Issues & The Creation Of LTL .............................2

    B.     The Doctors' March 2020 Peer-Reviewed Article ........................................4

    C.     Efforts By J&J To Chill Research Adverse To Its Commercial Interests ...................6

ARGUMENT ........................................................................................................6

    I.     LTL LACKS ARTICLE III STANDING. ...................................................7

    II.    LTL HAS NOT ALLEGED AND CANNOT PROVE FACTS
            SUFFICIENT TO ESTABLISH PERSONAL JURISDICTION. ...............10

        A.  The Court Lacks General Jurisdiction Over The Doctors. ...................10

        B.  There Is No Basis To Exercise Specific Jurisdiction ...........................11

    III.   LTL'S TRADE LIBEL FAILS AS A MATTER OF LAW ......................15

        A.  LTL Identifies No False Allegations Concerning Its Products. ..........15

           1.  Controlling Third Circuit precedent prohibits trade libel claims
               premised on nonactionable scientific opinions. ...........................15

           2.  LTL alleges no defamatory statements concerning its products. ...................20

        B.  LTL Has Not Alleged The Article Caused Any Special Damages. ........................21

    IV.   LTL'S FRAUD CLAIM FAILS AS A MATTER OF LAW .........................23

        A.  LTL Does Not Allege The Doctors Knowingly Made A False
           Representation Of Material Fact. ...................................................24

        B.  LTL Does Not Allege The Doctors Intended For LTL To Rely On
           The Article, Or That LTL Did In Fact Rely On It To Its Detriment. ....................26

        C.  LTL Does Not Allege Damages Caused By Its Alleged Reliance. .......................28

    V.    LTL'S LANHAM ACT CLAIM FAILS AS A MATTER OF LAW ...........29

        A.  LTL Alleges No "Commercial Advertising" By The Doctors. ............29

        B.  LTL Lacks Statutory Standing. ....................................................32

        C.  LTL Fails To Plead Core Elements Of Its Lanham Act Claim. ............34

           1.  None of the alleged statements is a false or misleading statement
               of fact about LTL's product(s) or the Doctors' services. ...................34

           2.  LTL fails to plausibly plead material deception. .............................35

           3.  LTL fails to plausibly plead likelihood of injury. ...........................36

        D.  The Doctors Are Entitled To Recover Attorneys' Fees And Costs For
           Having To Defend LTL's Frivolous Lanham Act Claim ........................36

CONCLUSION....................................................................................................38

## TABLE OF AUTHORITIES

### CASES

*Albion Eng'g Co. v. Hartford Fire Ins. Co.*,
  No. 117CV3569, 2018 WL 1469046 (D.N.J. Mar. 26, 2018) .................................... 21

*Allegheny Coupling Co. v. Betts Indus., Inc.*,
  No. CA 06-76, 2011 WL 1230151 (W.D. Pa. Mar. 31, 2011) .................................... 37

*Am. Bus. Lending Grp., Inc. v. Shainis*,
  No. 10-CV-02420, 2011 WL 691580 (D.N.J. Feb. 14, 2011) .................................... 10

*Andrews v. Eli Lilly & Co., Inc.*, 97 F.R.D. 494 (N.D. Ill. 1983) .................................. 25

*Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282 (D.N.J. 2009) ............................... 26

*Arista Recs., Inc. v. Flea World, Inc.*, 356 F. Supp. 2d 411 (D.N.J. 2005) .................................... 23

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................ 6, 7, 30, 36

*Auto. Fin. Corp. v. DZ Motors, LLC*,
  No. CV167955, 2017 WL 3176275 (D.N.J. July 26, 2017) .................................... 26

*Banco Popular N. Am. v. Gandi*, 876 A.2d 253 (N.J. 2005) ............................... 23, 27

*Baraka v. McGreevey*, 481 F.3d 187 (3d Cir. 2007) ....................................... 30, 36

*Baughman v. U.S. Liab. Ins. Co.*, 662 F. Supp. 2d 386 (D.N.J. 2009) ........................................ 24

*Bd. of Trustees of Leland Stanford Jr. Univ. v. Sullivan*,
  773 F. Supp. 472 (D.D.C. 1991) ............................................................... 31

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................ 7

*Bell v. Am. Int'l Indus*, 627 F. Supp. 3d 520 (M.D.N.C. Sept. 13, 2022) .................................... 25

*Benak ex rel. All. Premier Growth Fund v. All. Cap. Mgmt. L.P.*,
  435 F.3d 396 (3d Cir. 2006).  ............................................................... 3

*Blocker v. Small Bus. Admin.*, 916 F. Supp. 37 (D.D.C. 1996) ....................................... 9

*Bocobo v. Radiology Consultants of S. Jersey, P.A.*, 477 F. App'x 890 (3d Cir. 2012) ................ 22

*Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60 (1983) ....................................... 29, 32

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384 (D.N.J. 2009) ............ 31

*Brittle v. Warner Bros. Ent.*,
   No. 3:16-CV-00908-JAG, 2017 WL 11503437 (E.D. Va. Aug. 28, 2017)................................ 36

*Cairns v. Franklin Mint Co.,* 292 F.3d 1139 (9th Cir.2002) .......................................... 37

*Calder v. Jones,* 465 U.S. 783 (1984) ...........................................................................11

*Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141 (3d Cir. 1992)................................... 10

*Cerciello v. Canale,* No. CIV.A. 12-6933, 2013 WL 3939580 (E.D. Pa. July 31, 2013).............. 14

*Christie v. Nat'l Inst. for Newman Stud*., 258 F. Supp. 3d 494 (D.N.J. 2017) ..............................11

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) .......................................... 7, 9, 10

*Classic Media, Inc. v. Mewborn*, 532 F.3d 978 (9th Cir. 2008) .................................... 37

*Coffelt v. Kroger Co.*, No. EDCV161471, 2017 WL 10543343 (C.D. Cal. Jan. 27, 2017) ........... 3

*Cornette v. Graver*, 473 F. Supp. 3d 437 (W.D. Pa. 2020) .......................................... 29

*Crisafulli v. Amertias Life Ins. Corp.*,
   No. CIV.A. 13-5937, 2015 WL 1969176 (D.N.J. Apr. 30, 2015)................................................ 6

*Critical Care Diagnostics, Inc. v. Am. Ass'n for Clinical Chemistry, Inc.*,
   No. 13CV1308, 2014 WL 842951 (S.D. Cal. Mar. 4, 2014)................................................... 12

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006) ............................................ 7

*Dairy Stores Inc. v. Sentinel Pub. Co*., 516 A.2d 220 (N.J. 1986) ................................ 20

*Dare Invs., LLC v. Chicago Title Ins. Co.*,
   No. CIV. 10-6088, 2011 WL 2600594 (D.N.J. June 29, 2011) ................................................ 28

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ....................................... 17

*Decker v. Princeton Packet, Inc.*, 561 A.2d 1122 (N.J. 1989) ...................................... 19

*Ditri v. Coldwell Banker Residential Affiliates, Inc.*, 954 F.2d 869 (3d Cir. 1992) ............... 34, 36

*DSK Enterprises, Inc. v. United Jersey Bank*,
   459 A.2d 1201 (N.J. Super. Ct. App. Div. 1983)................................................................ 28

*EP Henry Corp. v. Cambridge Pavers, Inc.,* 383 F. Supp. 3d 343 (D.N.J. 2019)........................ 34

*Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007 (3d Cir. 2008)....................................... 30

*Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303 (3d Cir. 2014) ................................. 37

*Fair Wind Sailing v. Dempster, et al.*, No. 2011-cv-55 (D.V.I. Mar. 16, 2016) .......................... 37

*Farah v. Esquire Mag.*, 736 F.3d 528 (D.C. Cir. 2013) ..................................................... 29

*Farnsworth v. Procter & Gamble Co.*, 758 F.2d 1545 (11th Cir. 1985) ...................................... 25

*Finkelman v. Nat'l Football League*, 810 F.3d 187 (3d Cir. 2016).......................................... 33

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017 (2021)................................... 10

*Frederico v. Home Depot*, 507 F.3d 188 (3d Cir. 2007) ..................................................... 24

*Fulmer Co. v. Cutsforth Prod., Inc.*,
    No. CIV. A. 07-1158, 2008 WL 1758897 (W.D. Pa. Apr. 16, 2008)......................................... 13

*Gok v. Ports Am., Inc.*, No. 15-cv-3468, 2015 WL 4915518 (D.N.J. Aug. 17, 2015) ..................... 4

*Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*,
    859 F. Supp. 1521 (S.D.N.Y. 1994)..................................................................... 32

*Hampden Eng'g Corp. v. Shear Tech., LLC*,
    No. CV 15-7424, 2016 WL 8677215 (D.N.J. Aug. 26, 2016) ................................................ 21

*Hawkins v. Harris*, 661 A.2d 284 (N.J. 1995)........................................................ 16, 26

*Hepp v. Facebook*, 14 F.4th 204 (3d Cir. 2021) ........................................................... 14

*Hoover v. Morales*, 164 F.3d 221 (5th Cir. 1998) ......................................................... 32

*IDT Telecom, Inc. v. CVT Prepaid Sols., Inc.*,
    No. CIV.A. 07-1076, 2009 WL 5205968 (D.N.J. Dec. 28, 2009)............................................ 29

*Immanuel v. Cable News Network, Inc.*, 618 F. Supp. 3d 557 (S.D. Tex. 2022) ......................... 18

*IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254 (3d Cir. 1998)........................................ 12, 13

*In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*,
    No. CV 19-MD-2904, 2021 WL 5937742 (D.N.J. Dec. 16, 2021) ............................................ 7

*In re LTL Mgmt., LLC*, 64 F.4th 84 (3d Cir. 2023) ......................................................... 2

*In re LTL Mgmt., LLC*, 652 B.R. 433 (Bankr. D.N.J. 2023) .................................................. 2

*In re PHP Healthcare Corp.*, 128 F. App'x 839 (3d Cir. 2005).............................................. 3

*Intervet, Inc. v. Mileutis, Ltd.*, No. CV151371, 2016 WL 740267 (D.N.J. Feb. 24, 2016).......... 15

*Johnson v. Draeger Safety Diagnostics, Inc.*, 594 F. App'x 760 (3d Cir. 2014)......................... 24

*Juliano v. ITT Corp.*, No. 90-cv-1575, 1991 WL 10023 (D.N.J. Jan. 22, 1991) ......................... 23

*Konowicz v. Carr*, 838 F. App'x 1 (3d Cir. 2020) ........................................................... 30

*Konowicz v. Carr*, No. CV15-6913, 2019 WL 13402859 (D.N.J. May 31, 2019) ............... 30, 32

*Lampshire v. Proctor & Gamble Co.*, 94 F.R.D. 58 (N.D. Ga. 1982)........................................... 25

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)....................... 32, 33

*Liebler v. LG Elecs., U.S.A., Inc.*,
    No. 14-CV-03500, 2015 WL 3561590 (D.N.J. June 4, 2015)........................................... 24

*Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993)................................................ 26

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ...................................................................... 7

*Marks v. Alfa Grp.*, 369 F. App'x 368 (3d Cir. 2010) .................................................... 12

*Marten v. Godwin*, 499 F.3d 290 (3d Cir. 2007) ..................................................6, 11, 12

*Martin v. DHL Express (USA), Inc.*, 580 F. Supp. 3d 66 (D.N.J. 2022) ................................ 26, 28

*Martinez v. Union Officine Meccaniche S.P.A.*,
    No. 22-1364, 2023 WL 3336644 (3d Cir. May 10, 2023)........................................11, 14

*Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d 362 (D.N.J. 2004) ................................ 21, 22

*McCabe v. Ernst & Young, LLP.*, 494 F.3d 418 (3d Cir. 2007)................................................. 28

*McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003) .......................................................... 9

*Montich v. Miele USA, Inc.*, 849 F. Supp. 2d 439 (D.N.J. 2012) ................................................. 36

*Nahas v. Shore Med. Ctr.*, No. CIV. 13-6537, 2015 WL 3448021 (D.N.J. May 29, 2015).......... 23

*Neuss v. Rubi Rose, LLC*, No. CV16-2339, 2017 WL 2367056 (D.N.J. May 31, 2017)............. 27

*New Jersey Auto. Ins. Plan v. Sciarra*, 103 F. Supp. 2d 388 (D.N.J. 1998)............................... 20

*New Jersey Carpenters Health Fund v. Philip Morris, Inc.*,
    17 F. Supp. 2d 324 (D.N.J. 1998)....................................................................................... 28

*New Skies Satellites, B.V. v. Home2US Commc'ns, Inc.*, 9 F. Supp. 3d 459 (D.N.J. 2014).......... 27

*Newborn Bros. Co. v. Albion Eng'g Co.*, 481 F. Supp. 3d 312 (D.N.J. 2020) ............................. 30

*Nicholas v. Saul Stone & Co. LLC.*, 224 F.3d 179 (3d Cir. 2000) .................................................11

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*,
   290 F.3d 578 (3d Cir. 2002) ............................................................. 35

*NXIVM Corp. v. Sutton*, No. 06 CV 1051, 2007 WL 1876496 (D.N.J. June 27, 2007)............... 20

*O'Connor v. Sandy Lane Hotel C*o., 496 F.3d 312 (3d Cir. 2007)................................ 15

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014)............................... 37

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490 (2d Cir. 2013) ..................... 17, 18, 31

*Pacira Biosciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*,
   583 F. Supp. 3d 654 (D.N.J. 2022)...................................................... 10, 17

*Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*,
   63 F.4th 240 (3d Cir. 2023) ............................................................. *passim*

*Perez v. Hermetic Seal Corp.*, No. CV1605211, 2016 WL 5477990 (C.D. Cal. Sept. 27, 2016)... 2

*Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241 (3d Cir. 2011).......................... 35

*Peterka v. Setter*, No. 2-18-CV-1177, 2020 WL 12604754 (W.D. Pa. Feb. 5, 2020) .................. 29

*Peterson v. HVM LLC*, No. CV 14-1137, 2016 WL 845144 (D.N.J. Mar. 3, 2016) .................... 26

*Polanco v. Omnicell, Inc.*, 988 F. Supp. 2d 451 (D.N.J. 2013)........................................ 8

*Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n*, 819 F.2d 434 (3d Cir. 1987).................. 10

*Remick v. Manfredy*, 238 F.3d 248 (3d Cir. 2001) ................................................. 13

*Richards of Rockford, Inc. v. Pacific Gas & Elec. Co.*, 71 F.R.D. 388 (N.D. Cal. 1976)............. 25

*Riley v. Nat'l Fed'n. of the Blind of N.C., Inc.*, 487 U.S. 781 (1988) .......................... 32

*Ritger v. Gatlin*, No. CIVA 09-2688, 2010 WL 1490582 (D.N.J. Apr. 13, 2010)........................ 26

*Rockwell Automation, Inc. v. Radwell Int'l, Inc.*,
   No. CV 15-5246, 2016 WL 7018531 (D.N.J. Nov. 30, 2016) .................................. 35

*Saad v. Am. Diabetes Ass'n*, 123 F. Supp. 3d 175 (D. Mass. 2015)............................... 17

*Sanderson v. Culligan Int'l Co.*, 415 F.3d 620 (7th Cir. 2005).................................... 32

*Sciore v. Phung*, No. CV 19-13775, 2022 WL 950261 (D.N.J. Mar. 30, 2022) ................... 16, 22

*Shtutman v. Carr*,
   No. A-1064-15T1, 2017 WL 4402045 (N.J. Super. Ct. App. Div. Oct. 4, 2017)..................... 24

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) .................................................................. 7

*Steeplechase Arts & Prods., L.L.C. v. Wisdom Paths, Inc.*,
   No. CV2202031, 2023 WL 416080 (D.N.J. Jan. 26, 2023) .................................... 35

*ThermoLife Int'l, LLC v. Am. Fitness Wholesalers, L.L.C.*,
   831 F. App'x 325 (9th Cir. 2020) ............................................................................ 33

*Trex Co., Inc. v. CPG Int'l LLC*,
   No. 5:17-CV-00005, 2017 WL 3272013 (W.D. Va. Aug. 1, 2017). ......................... 30

*U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914 (3d Cir. 1990) ......... 29

*Underwager v. Salter*, 22 F.3d 730 (7th Cir. 1994) ........................................................ 17

*Voilas v. Gen. Motors Corp.*, 170 F.3d 367 (3d Cir. 1999) ............................................ 28

*Wakefern Food Corp. v. Marchese*,
   No. 2:20-CV-15949-WJM-MF, 2021 WL 3783259 (D.N.J. Aug. 26, 2021) ............ 31

*Walden v. Fiore*, 571 U.S. 277 (2014) ................................................................... 13, 14

*Wall & Assocs., Inc. v. Better Bus. Bureau of Cent. Va., Inc.*,
   685 F. App'x 277 (4th Cir. 2017) ............................................................................ 33

*Ward v. Zelikovsky*, 643 A.2d 972 (1994) ...................................................................... 16

*Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*,
   328 F. Supp. 3d 824 (N.D. Ill. 2018) ......................................................................... 3

*Yankee Candle Co. v. Bridgewater Candle Co.*, 140 F.Supp.2d 111 (D. Mass. 2001) ................ 37

## STATUTES

15 U.S.C. § 1117(a) ......................................................................................................... 36

35 U.S.C. § 285 ............................................................................................................... 36

## RULES

Fed. R. Civ. P. 9 ..................................................................................................... *passim*

Fed. R. Civ. P. 12 ................................................................................................... *passim*

Fed. R. Evid. 201(b)(2) ..................................................................................................... 3

## INTRODUCTION

This case arises out of a six-page scientific article researched and authored by Drs. Theresa Emory, John Maddox, and Richard Kradin (the "Doctors") "suggest[ing] that cosmetic talc may be a cause of malignant mesothelioma." *See* ECF No. 1-2 (the "Article"). That Article was peer-reviewed and published in the American Journal of Industrial Medicine (the "Journal"). It did not name or reference Johnson & Johnson ("J&J") or its products. It was published in March 2020—after J&J had faced a tsunami of personal injury claims concerning its talc products, including a blockbuster multi-billion dollar verdict in 2016, and after J&J recalled Johnson's Baby Powder in 2019 when the Food and Drug Administration ("FDA") found a sample was contaminated with asbestos. Ignoring all of these facts, Plaintiff LTL Management LLC ("LTL")—the J&J subsidiary created to absorb the company's mounting liabilities arising from talc-related litigation, ECF No. 1 ¶ 12 ("Compl."), now claims that the Article—not the myriad problems plaguing the company for years before its publication—is the cause of its financial woes relating to its talc business.

This theory is frivolous on its face, and requires dismissal for at least three reasons. *First,* LTL lacks Article III standing because none of its alleged injuries are traceable to the Article. *Second,* the Complaint's jurisdictional problems do not end there, as there also is no basis for the Court to exercise personal jurisdiction over the Doctors. *Third*, even assuming the Complaint could clear these hurdles, each of LTL's claims suffers from a host of pleading deficiencies that reflect claims that are not only implausible, but frivolous. This is not a case about fraudulent statements defaming LTL or its products. It is a case about LTL attempting to silence Doctors whose (protected) speech is adverse to its corporate interests. For the reasons discussed herein, the Court should dismiss LTL's Complaint with prejudice.

1

# BACKGROUND

## A. Johnson & Johnson's Talc-Related Issues & The Creation Of LTL.

J&J's defense of litigation alleging that its cosmetic talc products cause cancer—and its eventual creation of LTL to spin off its resulting tort liability into bankruptcy—have been recounted at length by the Third Circuit and Judge Kaplan. *See In re LTL Mgmt., LLC*, 64 F.4th 84, 92–99 (3d Cir. 2023); *In re LTL Mgmt., LLC*, 652 B.R. 433, 437–41 (Bankr. D.N.J. 2023).[1] Aspects of these events provide relevant context for this litigation, and are briefly described below.

**J&J's Involvement In Talc Litigation.** As LTL detailed in briefing it filed to initiate its first bankruptcy attempt, J&J has been involved in litigation relating to its cosmetic talc products since the 1980s, culminating in a "tidal wave" of lawsuits that, as LTL describes, began with a pair of jury verdicts in 2013 and 2016, the latter of which resulted in "the fifth largest personal injury verdict in the history of the United States—a plaintiff verdict of $4.69 billion." *See* Informational Br. of LTL Mgmt. LLC, *In re LTL* Management, No. 21-30589 (Bankr. D.N.J. Oct. 14, 2021), ECF No. 3 (hereafter, "LTL Informational Br.") at 45–48 (describing how these lawsuits were the catalyst for significant talc litigation, initially focused on ovarian cancer and subsequently— "[w]ithin two months of the [2016] trial"—mesothelioma).[2] According to LTL, "[b]y the beginning of 2017, more than 100 mesothelioma cases had been filed" against J&J. LTL Informational Br. at 48. By LTL's account, the vast majority of mesothelioma cases against J&J were filed before 2020. *See id.* at 49, 126 (reporting 954 cases filed 2017-2019 versus 391 filed 2020-2021).

---

[1] The Third Circuit dismissed LTL's first bankruptcy attempt, finding it was not filed in good faith. *In re LTL Mgmt., LLC*, 64 F.4th at 110. Judge Kaplan dismissed LTL's second bankruptcy attempt on similar grounds. *In re LTL Mgmt., LLC*, 652 B.R. at 437–441.

[2] Courts may take judicial notice of jury verdicts (*e.g.* date, dollar amount). *See, e.g.*, *Perez v. Hermetic Seal Corp.*, No. CV1605211, 2016 WL 5477990, at *3 (C.D. Cal. Sept. 27, 2016) (collecting cases and noting that "[c]ourts have previously taken judicial notice of jury verdicts").

**Media Coverage.** These lawsuits and history-making jury verdicts attracted significant media attention. As LTL has explained, "[s]ince the onset of cosmetic talc litigation against J&J," "there have been tens of thousands of press articles concerning Johnson's Baby Powder and talc litigation." *Id.* at 96. Among these were lengthy exposés published in 2018 by Reuters and the New York Times.[3] J&J's stock price plummeted after the publication of the Reuters article.[4]

**2019 FDA Recall.** In 2019, the Food and Drug Administration ("FDA") reported that a sample of Johnson's Baby Powder was contaminated with asbestos, leading J&J to recall approximately 33,000 bottles of talc.[5] J&J's stock plummeted once again.[6]

**J&J's Voluntary Discontinuation of Talc Products.** In May 2020, LTL announced its decision to discontinue talc-based Johnson's Baby Powder in the United States and Canada. Compl. ¶ 142. According to the press release LTL cites in its Complaint, *id.* ¶ 142, "[a]s part of a portfolio assessment related to COVID-19," in March 2020, J&J "stopped shipping hundreds of items in the U.S. and Canada to prioritize high-demand products and to allow for appropriate social

---

[3] *See* Lisa Girion, *Special Report: J&J knew for decades that asbestos lurked in its Baby Powder*, REUTERS: HEALTHCARE & PHARMA (DEC. 14, 2018), *available at* https://bit.ly/ReutersDec142018; Roni Rabin & Tiffany Hsu, *Johnson & Johnson Feared Baby Powder's Possible Asbestos Link for Years*, N.Y. TIMES (Dec. 14, 2018), *available at* https://bit.ly/NYTimesDec142018. The Court may take judicial notice of these articles. *Benak ex rel. All. Premier Growth Fund v. All. Cap. Mgmt. L.P.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006).

[4] *See, e.g.*, Angelica LaVito, *J&J shares plunge 10% after report that the company knew for decades about asbestos in baby powder*, CNBC (Dec. 14, 2018), https://bit.ly/CNBCDec142018 ("J&J stock had fallen 10.04 percent, its worst day in more than a decade . . ."). The court may take judicial notice of the stock price. *See In re PHP Healthcare Corp.*, 128 F. App'x 839, 844 (3d Cir. 2005); Fed. R. Evid. 201(b)(2).

[5] *See Baby powder manufacturer voluntarily recalls products for asbestos*, FDA (Oct. 18, 2019), https://bit.ly/FDAOct182019; *FDA Advises Consumers to Stop Using Certain Cosmetic Products*, FDA (Oct. 18, 2019), https://bit.ly/FDAAlertOct182019-2. The Court may take judicial notice of the recall. *See, e.g.*, *Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 828 (N.D. Ill. 2018) (taking judicial notice of FDA recall); *Coffelt v. Kroger Co.*, No. EDCV161471, 2017 WL 10543343, at *1 (C.D. Cal. Jan. 27, 2017) (similar).

[6] *See* Paul R. La Monica, *Johnson & Johnson stock falls after asbestos found in baby powder*, CNN BUSINESS (Oct. 18, 2019), *available at* https://bit.ly/CNBCOct182019.

distancing in manufacturing and distribution facilities during this unprecedented pandemic."[7] In the same press release, J&J announced that "[f]ollowing this action," as of May 2020, the Company had "decided to permanently discontinue . . . talc-based Johnson's Baby Powder." *Id.*

**B. The Doctors' March 2020 Peer-Reviewed Article.**

In March 2020—after the jury verdicts, media exposés, and FDA recall described above, and coinciding with J&J's "portfolio assessment" amid the COVID-19 pandemic—Drs. Theresa Emory, John Maddox, and Richard Kradin published a peer-reviewed article entitled "Malignant mesothelioma following repeated exposures to cosmetic talc: A case series of 75 patients," in the American Journal of Industrial Medicine. ECF No. 1-2. The Journal's stated goals are "to advance and disseminate knowledge, promote research and foster the prevention of disease and injury."[8] It reports its "Readership" as including: "[o]ccupational and environmental health physicians, epidemiologists, toxicologists, oncologists, neuroscientists, biochemists, and pathologists." *Id.*

The Article was based on the Doctors' analysis of records concerning 75 individuals with malignant mesothelioma who reportedly had no known asbestos exposure other than to cosmetic talc. *Id.* at 2. The Article discloses (in three places) that the subjects were identified through medical-legal consultation. Compl. ¶ 32; ECF No. 1-2 at 2, 5, 7. One hundred and forty subjects were initially reviewed for potential inclusion. ECF No. 1-2 at 3. Sixty-five were excluded because of other known exposure to asbestos, leaving 75 subjects in the study. *Id.* The subjects were anonymized and, consistent with standard scientific practice and medical ethics rules, their

---

[7] *Johnson & Johnson Consumer Health Announces Discontinuation of Talc-based Johnson's Baby Powder in U.S. and Canada*, Press Release (May 19, 2020), *available at* https://bit.ly/JJMay192020 (hereafter "J&J May 2020 Press Release"). The Court may consider the press release, which was incorporated by reference in the Complaint. *Gok v. Ports Am., Inc.*, No. 15-cv-3468, 2015 WL 4915518, at *2 (D.N.J. Aug. 17, 2015).
[8] *See* American Journal of Industrial Medicine, "About," *available at* https://bit.ly/AJIMAbout.

identities have never been disclosed, including to the subjects themselves. As LTL documents, the Doctors have fought to keep their identities confidential. *See* Compl. ¶ 131–38.

The Doctors concluded in the Article that "[t]he findings of the present and other recent studies suggest that cosmetic talc *may be* a cause of malignant mesothelioma," and that "[l]arge-scale controlled studies will be required to assess the prospective risk of developing mesothelioma following repeated exposures to talc." ECF No. 1-2 at 7 (emphasis added). The Article did not name J&J, its products, or any other particular talc brands, products, or manufacturers. Nor did it conclude that "cosmetic talc powder causes mesothelioma," as LTL has alleged, *see, e.g.*, Compl. ¶ 28. The Article's conflicts of interest disclosure further states: "Drs. Emory, Maddox, and Kradin have testified in asbestos litigation, primarily for plaintiffs." Compl. ¶ 32; ECF No. 1-2 at 7.

Shortly after publishing the Article, Dr. Emory gave a brief interview summarizing the Article which was published on the website "MedicalResearch.com," Compl. ¶ 43, ECF No. 1-4, which "select[s] key journal articles and publish interviews from the designated researchers in a standardized format familiar to members of the broad medical community."[9] *See* ECF No. 1-4.

The following month (April 2020), the Doctors published a response to a letter to the editor concerning the Article (the "Letter") in the Journal. Compl. ¶ 36; ECF No. 1-3. The Doctors reiterated that they "began with a series of 140 patients which was reduced to 75" after excluding "those where a history of other asbestos exposures were present." ECF No. 1-3 at 2. They then explained: "In legal cases, experts supporting both the plaintiffs and the defense regularly search for all exposures to asbestos. If, in our series, an odd case or two without such recollection may have been included, then there would still be an abundance of cases to support our findings." *Id.* And the Doctors acknowledged the Article's limitations, including "that a case series does not in

---

[9] *About MedicalResearch.com*, https://medicalresearch.com/about-us/.

itself 'prove' causation," though that it "can be critical in advancing our knowledge of disease." *Id.* The Letter included the same conflicts of interest disclosure as the Article. *Id.*

Most content published by the Journal is not freely available to the public; rather, access is limited to paid subscribers. *See* Letter, *available at* https://bit.ly/AJIMLetter.  A person without a recurring subscription who wished to read the Letter, for example, could choose to purchase limited online access, permanent online access, or a PDF download for $12 to $49. *Id.*

### C.  Efforts By J&J To Chill Research Adverse To Its Commercial Interests.

This lawsuit is part of a long and well-documented history of J&J attempting to silence doctors and scientists whose research is at odds with its interests. *See, e.g.*, *supra* n.3 (Reuters article discussing a 1972 internal J&J memo entitled "Antagonistic Personalities" listing scientists who helped establish links between cosmetic talc, asbestos, and various cancers). LTL first filed this lawsuit in its since-vacated bankruptcy proceeding. *See* Compl., *In re LTL Management LLC*, No. 23-1022 (Bankr. D.N.J. Jan. 18, 2023), ECF No. 1. Five months later came this lawsuit.

## ARGUMENT

Each of LTL's claims should be dismissed for multiple reasons. LTL cannot meet its burden to establish this Court has subject matter jurisdiction under Rule 12(b)(1) and Article III, because it has not "demonstrate[d] a plausible claim of standing." *Crisafulli v. Amertias Life Ins. Corp.*, No. CIV.A. 13-5937, 2015 WL 1969176, at *2 (D.N.J. Apr. 30, 2015). This Court also lacks personal jurisdiction over each of the Doctors under Rule 12(b)(2), because none is at home in the forum or has purposeful contacts that form the basis of this suit. *Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007) (discussing general and specific jurisdiction standards). And even if this Court could exercise jurisdiction over LTL's claims, each lacks "sufficient factual matter . . . to state a claim to relief that is plausible on its face" under Rule 12(b)(6).  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[T]hreadbare recitals of the elements of a cause of action, supported by mere

conclusory statements" are insufficient, *id.*, as are bald "labels and conclusions" unsupported by sufficient factual allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). LTL's trade libel and fraud claims also fail Rule 9(b) and 9(g)'s heightened pleading requirements.

## I.      LTL LACKS ARTICLE III STANDING.

"'[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'" *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341–42 (2006). Here, LTL fails to satisfy Article III's mandate that it must allege facts sufficient to show injury "fairly traceable to the challenged action,'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013), "for each claim" it asserts, *DaimlerChrysler*, 547 U.S. at 352. *See also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (plaintiff must plausibly allege "causal connection between" alleged injury "and the conduct complained of"); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (similar). LTL's theory is that a peer-reviewed article that does not name J&J or its products and was published in a medical journal *after* J&J already faced billions of dollars in tort liability, had been the subject of high-profile media exposés, and been forced to recall talc products after FDA testing revealed asbestos contamination, *see supra*, Background Section, caused its sales to decline. *See, e.g.*, Compl. ¶ 141. But alleging that one event followed another does not support a plausible inference that the earlier event caused the latter. For at least two reasons, LTL cannot carry its burden to demonstrate    traceability,    and    the    Court    thus    lacks    subject    matter    jurisdiction.

*First*, the timing of the events alleged in the Complaint shows the Doctors did not and could not have caused LTL's alleged harm. *See, e.g.*, *In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*, No. CV 19-MD-2904, 2021 WL 5937742, at *11 (D.N.J. Dec. 16, 2021) (plaintiff failed to show Article III traceability where harm occurred before conduct

alleged). J&J's alleged injuries focus on its decision to discontinue sale of talc-based products. Compl. ¶ 142. LTL does not allege, however, any facts to show that demand for or sales of talc products declined between March 2020 (when the Article was published) and May 2020 (when J&J discontinued talc sales), such that the Court could infer that the Article influenced consumer behavior. Nor does it allege that any decline during that time period was atypical, or a departure from any ongoing decline in demand attributable to the FDA recall and blockbuster trial verdicts. J&J instead attempts to show traceability by pointing to a press release attributing the product's withdrawal to declining demand for the product "due in large part to changes in consumer habits." *Supra* n.7 (J&J May 2020 Press Release). But it simply is not plausible that an article published in in a medical journal (whose audience is doctors, not consumers) could have caused "changes in consumer habits" quickly or forcefully enough to cause a Fortune 50 company to pull a signature product from the market two months later. Nor can LTL manufacture Article III standing by advancing conclusory allegations related to increased litigation and settlement costs, *see* Compl. ¶ 143. LTL does not allege facts showing that talc litigation (i) increased after March 2020 and/or (ii) was increasingly successful as a result of the Article. In fact, LTL's admissions show just the opposite, with talc litigations declining in frequency after 2019, and record-breaking verdicts pre-dating the Article's publication. *See supra*, Background Section.

**Second**, LTL's theory of harm is too attenuated and punctured by too many intervening independent factors to satisfy Article III. *See Polanco v. Omnicell, Inc.*, 988 F. Supp. 2d 451, 465 (D.N.J. 2013) (plaintiff lacked standing based on intervening third-party actions). LTL's claims are primarily premised on statements made in the Article and Letter. *See* Compl. ¶¶ 28–41. Because there is no basis to believe that any consumer would even have been aware of, let alone influenced by, either publication, LTL tries to bridge the gap by highlighting statements made by third parties

about the Article. *See id.* ¶¶ 44–52, 55–56, 58–64. Even setting aside that some of these third-party statements were made *after* J&J decided to pull its talc products from the North American market, *see, e.g., id.* ¶ 44 (citing article published in December 2020), these independent statements stand between LTL's purported injuries and the Doctors' alleged conduct and sever the causal chain. *See Clapper*, 568 U.S. at 414 n.5 (it is plaintiff's burden to allege "concrete facts" to show Article III traceability, and "cannot rely on speculation about the unfettered choices made by independent actors not before the court") (internal quotation marks and citation omitted).

The same is true for J&J's decision to discontinue North American sales of its talc products. The Doctors had nothing to do with this "personal choice" by J&J, which is yet another intervening cause of its alleged lost profits that interrupts the causal chain. *See, e.g.*, *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 228 (2003), *overruled on other grounds by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010); *Blocker v. Small Bus. Admin.*, 916 F. Supp. 37, 41–42 (D.D.C. 1996) (connection between plaintiff's injuries and defendant's conduct too attenuated to confer standing where plaintiff took steps that contributed to her own financial injuries).

Moreover, LTL itself has repeatedly attributed its declining sales and product withdrawal to factors other than the Article or any other conduct by the Doctors. For example, LTL (represented by one of the same counsel as here) initiated its first bankruptcy attempt with a lengthy brief detailing all of the bases for its supposed financial woes. Across those 128 pages, the Article is referenced just twice, both times in passing footnote references. *See* LTL Informational Br. at 74 n.280 (citing the Article as one "of two studies published by plaintiffs' expert witnesses that discuss patients with mesothelioma who were evaluated as part of a 'medical-legal evaluation[,]" which LTL argued were "not probative to" whether cosmetic talc may cause mesothelioma); *id.* at 95 n.381 (citing the Article to argue that various plaintiffs' experts have published articles

suggesting a link between talc and mesothelioma).[10] LTL never argued that the Article or testimony by the Doctors caused its alleged financial distress, and LTL's Complaint offers no factual basis to believe it did. The Court should therefore find that LTL's "speculative chain of possibilities" is insufficient under Article III. *Clapper*, 568 U.S. at 414.

## II. LTL HAS NOT ALLEGED AND CANNOT PROVE FACTS SUFFICIENT TO ESTABLISH PERSONAL JURISDICTION.

LTL also cannot sustain its burden of proving personal jurisdiction over the Doctors. The Court has personal jurisdiction over each nonresident Defendant only to the extent authorized under New Jersey law, which "provides for personal jurisdiction as far as is permitted by the Fourteenth Amendment." *Am. Bus. Lending Grp., Inc. v. Shainis*, No. 10-CV-02420, 2011 WL 691580, at *3 (D.N.J. Feb. 14, 2011) (citing N.J. Ct. R. 4:4-4). LTL has not made a *prima facie* showing of either general or specific personal jurisdiction by "establishing with reasonable particularity sufficient contacts between the defendant and the forum state."[11] *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 146 (3d Cir. 1992).

### A. The Court Lacks General Jurisdiction Over The Doctors.

General jurisdiction may only be exercised over a defendant who has "continuous and substantial" contacts with the forum. *Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987). For individuals, the paradigmatic case is the place of his or her domicile. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021). None

---

[10] This includes Dr. Moline, who LTL has separately sued for similar reasons. *See* Compl. ¶ 2.

[11] The fact that Defendants so clearly lack sufficient contacts with this forum highlights the frivolous nature of LTL's Complaint. But to the extent the Court concludes that LTL has failed to state a claim under Rule 12(b)(6), it can and should dismiss the case with prejudice on this basis without reaching Defendants' personal jurisdiction arguments, to relieve Defendants of the burden of defending against these frivolous claims elsewhere. *See, e.g.*, *Pacira Biosciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*, 583 F. Supp. 3d 654, 659 n.11 (D.N.J. 2022), *aff'd*, 63 F.4th 240 (3d Cir. 2023) (dismissing claim under 12(b)(6) and declining to reach defendants' arguments under 12(b)(2)).

of the defendants here is domiciled in the forum. Compl. ¶ 17. Nor do any of the Doctors practice medicine, own or lease real property, or hold any bank accounts in New Jersey. *See* Ex. 1, Decl. of Dr. Theresa S. Emory ¶¶ 4–6 (Sept. 12, 2023) ("Emory Decl."); Ex. 2, Decl. of Dr. John C. Maddox ¶¶ 4–6 (Sept. 12, 2023) ("Maddox Decl."); Ex. 3, Decl. of Dr. Richard L. Kradin ¶¶ 6–8 (Sept. 12, 2023) ("Kradin Decl.").[12] The exercise of general jurisdiction here therefore would be improper.

### B.  There Is No Basis To Exercise Specific Jurisdiction.

Nor can this Court exercise specific jurisdiction over the Doctors. Courts conduct a three-part, claim-by-claim inquiry to assess specific jurisdiction, focused on whether (i) each defendant "purposefully directed his activities at the forum"; (ii) the plaintiff's claim arose out of or relates to at least one of those activities; and (iii) any additional factors to ensure that jurisdiction comports with "fair play and substantial justice." *Marten*, 499 F.3d at 296; *see also Nicholas v. Saul Stone & Co. LLC.*, 224 F.3d 179, 184 (3d Cir. 2000) (each defendant "must be assessed individually"). LTL has not alleged, nor could it prove, sufficient facts to establish a *prima facie* case of specific jurisdiction as to any of the Defendants or any of the claims under this inquiry.

**Purposeful Availment or Direction.** LTL's Complaint fails the first prong because it alleges no acts by which each defendant "purposefully avail[ed himself or herself] of the privilege of conducting activities within the forum State." *Martinez v. Union Officine Meccaniche S.P.A.*, No. 22-1364, 2023 WL 3336644, at *1 (3d Cir. May 10, 2023). LTL's claims focus on the Doctors' efforts to research and write the Article. But the Doctors do not live in New Jersey, *see* Compl. ¶¶ 13–15 (confirming the Doctors live in Virginia and New Hampshire), and did not work on the Article in New Jersey. Emory Decl. ¶ 9; Maddox Decl. ¶ 8; Kradin Decl. ¶ 11; *see Calder v. Jones,*

---

[12] Where jurisdictional allegations are "contradicted by the defendant through opposing affidavits or other evidence . . . the plaintiff must respond with actual proofs, not mere allegations." *Christie v. Nat'l Inst. for Newman Stud.*, 258 F. Supp. 3d 494, 511 (D.N.J. 2017).

465 U.S. 783, 789 (1984) (finding that defamatory article written in Florida was "Florida conduct"). It makes no difference that Dr. Maddox has testified as an expert in New Jersey, *see* Compl. ¶ 27, because this conduct cannot form the basis of any of LTL's claims as a matter of law. *See infra* n.13 & § IV.A (litigation privilege precludes trade libel or fraud claims based on expert testimony); *infra* § V.A. (expert testimony is non-commercial speech under the Lanham Act).

Nor is LTL's case for specific jurisdiction helped by the *Calder* "effects test," pursuant to which "an intentional tort directed at the plaintiff and having sufficient impact upon it in the forum may suffice to enhance otherwise insufficient contacts." *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 259–60 (3d Cir. 1998). The *Calder* test is "applied narrowly," *Marks v. Alfa Grp*., 369 F. App'x 368, 370 (3d Cir. 2010), and requires LTL to show: (1) the Doctors committed an intentional tort; (2) LTL felt the brunt of the harm in the forum; and (3) the Doctors expressly aimed their tortious conduct at the forum. *IMO Indus.,* 155 F.3d at 265–66.

The Court need not consider the first two elements, as the "expressly aimed" element is not met. *See Marten*, 499 F.3d at 297–98. The Article does not even reference much less expressly target LTL or its products. *Infra* § III.A.2; s*ee Critical Care Diagnostics, Inc. v. Am. Ass'n for Clinical Chemistry, Inc.*, No. 13CV1308, 2014 WL 842951, at *7 (S.D. Cal. Mar. 4, 2014) (plaintiff failed to show conduct expressly aimed at the forum where scientific article did not focus on plaintiff or its product); *cf. Marks*, 369 F. App'x at 370–71 (no jurisdiction under *Calder* where alleged defamatory article did not refer to forum or to plaintiff's business). It instead is a scientific article related to the potential connection between cosmetic talc generally and mesothelioma.

The Complaint is likewise devoid of any factual allegations that could support a finding that the Doctors expressly aimed their conduct at New Jersey. The closest LTL comes is baldly alleging that Defendants (i) "knew that LTL's principal place of business was in New Jersey" and

(ii) "targeted New Jersey with their false statements." Compl. ¶ 140. But "[s]imply asserting that the defendant knew that the plaintiff's principal place of business was located in the forum [is] insufficient" to satisfy *Calder*. *IMO Indus.*, 155 F.3d at 265. "[F]inding jurisdiction on that basis, alone, would render the requirements of personal jurisdiction illusory as every plaintiff suffers harm in the state where he or she resides." *Fulmer Co. v. Cutsforth Prod., Inc.*, No. CIV. A. 07-1158, 2008 WL 1758897, at *3 (W.D. Pa. Apr. 16, 2008) (no specific jurisdiction due to lack of facts demonstrating the defendant's alleged commercial disparagement was targeted at the forum).

LTL's vague assertions that its products were prominent in the cosmetic talc industry, *see* Compl. ¶¶ 152–53, do not change the calculus. Such allegations are insufficient where there is no "unique relationship" between New Jersey and the industry at large. *See Remick v. Manfredy*, 238 F.3d 248, 259 (3d Cir. 2001) (no allegations Pennsylvania had unique relationship with boxing industry, as distinguished from unique relationship in *Calder* between California and film industry); s*ee also Walden v. Fiore*, 571 U.S. 277, 285–86 (2014) ("plaintiff cannot be the only link between the defendant and the forum"). It would also be especially inappropriate to infer any unique relationship here, where LTL alleges that the Article "was widely circulated to the public nationwide," Compl. ¶ 174, as the Doctors intended. Emory Decl. ¶ 10; Maddox Decl. ¶ 9; Kradin Decl. ¶ 13. That the Article may have been read by New Jersey residents likewise is insufficient as a matter of law to confer jurisdiction. *See Remick*, 238 F.3d at 259 (defendant did not target the forum where defamatory letter was allegedly shared within boxing community nationwide).

LTL's sole remaining allegation is that the Journal is operated by a New-Jersey based publishing company (Wiley). Compl. ¶ 41 But LTL fails to allege that the Doctors had any contact with the publisher, or otherwise specifically sought out Wiley to assist with focused distribution in New Jersey. Such "random, fortuitous, or attenuated contacts" do not establish a basis for personal

13

jurisdiction. *Walden*, 571 U.S. at 286; *see also, e.g., Cerciello v. Canale,* No. CIV.A. 12-6933, 2013 WL 3939580, at *7 (E.D. Pa. July 31, 2013), *aff'd*, 563 F. App'x 924 (3d Cir. 2014) (actions did not "rise to the level of targeted action" at forum where defendant did not "oversee the distribution or publishing" of the article at issue and there was no evidence distribution was focused on the forum "more than any other state").

**Arise Out of or Relate to.** LTL also cannot satisfy the second prong. Because the Doctors lack minimum contacts with New Jersey, LTL's claims cannot "arise out of, or relate to" those non-existent contacts. The *only* conduct alleged to have occurred in the forum is Dr. Maddox's expert testimony, Compl. ¶ 27, which cannot form the basis of any of LTL's claims against Dr. Maddox, and certainly not against Drs. Emory or Kradin. *See infra* n.13 & §§ IV.A, V.A.; Emory Decl. ¶ 7; Kradin Decl. ¶ 9. As a matter of law, LTL's claims cannot "relate to" or "arise out of" forum-related activity that is irrelevant to their claims. *See Hepp v. Facebook*, 14 F.4th 204, 208 (3d Cir. 2021) (required "strong relationship among the defendant, the forum, and the litigation" lacking where alleged forum-related contacts did not "form a strong connection" to the claim). For the same reason, Dr. Kradin's role as a contributing editor to the Journal in 2017 to 2019 is irrelevant, as it does not form as the basis of any of LTL's claims. Compl. ¶¶ 7, 38; Kradin Decl. ¶ 12.

**Fair Play and Substantial Justice.** Although the Court need not address the third prong given LTL's shortcomings under the first two prongs, *Martinez*, 2023 WL 3336644, at *1, there can be little doubt that the exercise of jurisdiction here does not comport with traditional notions of fair play and substantial justice. The Doctors are individuals who reside hundreds of miles away from New Jersey and would face significant burdens in defending themselves in this forum. Conversely, LTL is a large corporation with a ubiquitous presence across the country and substantially greater resources with which to pursue its claims. Moreover, given that New Jersey

was not the focal point or target of the alleged tortious conduct, it has no greater interest in adjudicating this dispute than other forums. These considerations render jurisdiction unreasonable. *See O'Connor v. Sandy Lane Hotel C*o., 496 F.3d 312, 324 (3d Cir. 2007).

## III.   LTL'S TRADE LIBEL CLAIM FAILS AS A MATTER OF LAW.

Even setting aside the Complaint's jurisdictional issues, each of LTL's claims fails to state a claim.[13] Start with trade libel. Just months ago, the Third Circuit squarely held that "critiques about" a scientific article's "data and methodology may be the basis of future scholarly debate, but they do not form the basis for trade libel under New Jersey law." *Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*, 63 F.4th 240, 248 (3d Cir. 2023) (affirming dismissal of trade libel claim). Undeterred, LTL has attempted to plead around this binding precedent by painting its claim as one targeting misstatements based on allegedly fabricated data and methodology. It is not. *Pacira* mandates dismissal of LTL's trade libel claim because (i) it challenges nonactionable scientific opinions, not "false allegations concerning plaintiff's property or product"; and (ii) LTL does not identify any "special damages" caused by the alleged misstatements. *Id.* at 245 n.8.

### A.   LTL Identifies No False Allegations Concerning Its Products.

1.   <u>Controlling Third Circuit precedent prohibits trade libel claims premised on nonactionable scientific opinions.</u>

Earlier this year, the Third Circuit reaffirmed that trade libel, like its close cousin defamation, is subject to various "privileges" and "limitations," including that "opinion statements are generally nonactionable." *Id.* at 245. In other words, "[s]tatements of pure opinion, which are those 'based on stated facts or facts that are known to the parties or assumed by them to exist,' do not provide a basis for relief." *Id*. And if a "statement could be construed as either fact or opinion,"

---

[13] Although the Complaint labels this claim as one for injurious falsehood or product disparagement, these terms are synonymous with "trade libel." *Pacira*, 63 F.4th at 244 n.7; *Intervet, Inc. v. Mileutis, Ltd.*, No. CV151371, 2016 WL 740267, at *6 (D.N.J. Feb. 24, 2016).

it "must" be construed "as an opinion" to avoid "imposing a chilling effect on speech." *Id.* at 245 n.9. "Whether a statement is a nonactionable opinion is a threshold question of law," that requires consideration of "the (1) content; (2) verifiability; and (3) context of the statements." *Id.* at 245. LTL's trade libel claim challenges two types of statements primarily published in the Journal: the Doctors' assertions that (i) the study subjects' "only known exposure to asbestos was repeated exposures to cosmetic talcum powders" and (ii) the study "excluded those where a history of other asbestos exposures were present." Compl. ¶ 146. Neither is an actionable statement of fact.[14]

**Content.** The first prong requires consideration "not merely of a statement's literal meaning, but also of the fair and natural meaning that reasonable people of ordinary intelligence would give to it." *Pacira*, 63 F.4th at 245. The core inquiry is whether the statement contains "defamatory content such that harm to reputation can be shown." *Ward v. Zelikovsky*, 643 A.2d 972, 978 (1994). The statements challenged here do not contain any "specific references to Plaintiff[], let alone false or defamatory statements about Plaintiff[]." *Sciore v. Phung*, No. CV 19-13775, 2022 WL 950261, at *10 (D.N.J. Mar. 30, 2022) (finding statements' content was "not defamatory" and granting motion to dismiss trade libel claim). At most, the doctors and others who read the Article might interpret the statements to indicate that (subject to all of the study's disclosed limitations), the materials the Doctors reviewed in connection with the study did not identify any other known exposure to asbestos. No reasonable person would construe such a statement regarding the Article's methodology to defame a company never mentioned (Johnson & Johnson)

---

[14] LTL also cannot manufacture a trade libel claim based on the Doctors' refusal to disclose the study subjects' identity in connection with their expert testimony, as this was both entirely proper, *see infra* § IV.A (discussing applicable medical ethics rules), and protected by New Jersey's absolute "doctrine of litigation immunity." *Hawkins v. Harris*, 661 A.2d 284, 288 (N.J. 1995). The same doctrine precludes any claim based on the Doctors' expert testimony, or others' reliance on the Article in cosmetic talc litigation filed against LTL. *Compare id. with* Compl. ¶ 159.

much less its specific products (Johnson's Baby Powder and Shower to Shower products).

**Verifiability.** The "concept of verifiability" requires this Court to determine whether the challenged statements are "capable of . . . truth or falsity." *Pacira*, 63 F.4th at 246. Here they are not. Under *Pacira*, "tentative scientific conclusions" are nonactionable opinions incapable of verification. *Id.* at 246–48. It is the "essence of the scientific method that the conclusions of empirical research are tentative and subject to revision, because they represent inferences about the nature of reality based on the results of experimentation and observation." *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 496 (2d Cir. 2013) (affirming dismissal of injurious falsehood claim premised on scientific article); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993) ("Scientific conclusions are subject to perpetual revision."). And so "while statements about contested and contestable scientific hypotheses constitute assertions about the world that are in principle matters of verifiable 'fact,'" "they are more closely akin to matters of opinion" that cannot form the basis of a trade libel claim. *ONY, Inc.*, 720 F.3d at 497.

Courts therefore find that it would be improper to permit "critiques" about a scientific article's "data and methodology . . . to form the basis for trade libel" or defamation claims, out of concern that "conclud[ing] otherwise would risk 'chilling' the natural development of scientific research and discourse." *Pacira*, 63 F.4th at 248; *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994) (dismissing defamation claim); *Saad v. Am. Diabetes Ass'n*, 123 F. Supp. 3d 175, 179 (D. Mass. 2015) (dispute "over the reliability of the data" in medical articles was "not fit for resolution in the form of a defamation lawsuit"). "This is especially true where, as here, a challenged statement occurred in a peer-reviewed journal 'directed at the scientific community,' as opposed to an advertisement directed at consumers." *Pacira*, 583 F. Supp. 3d at 659.

17

*Pacira* controls here. That opposing experts in cosmetic talc cases present competing scientific opinions shows that whether or not an individual has an alternative asbestos exposure is a hotly "contested and contestable scientific" issue. *ONY, Inc.*, 720 F.3d at 497; *see also Immanuel v. Cable News Network, Inc.*, 618 F. Supp. 3d 557, 564 (S.D. Tex. 2022), *appeal dismissed,* No. 22-20455, 2022 WL 18912180 (5th Cir. Sept. 27, 2022) ("Statements of different, even conflicting, opinions, about unsettled matters of scientific or medical treatment that are the subject of ongoing public debate and deep public interest, cannot give rise to defamation claims."). Just as in *Pacira*, the Article and Letter expressly acknowledged certain "limitations," "variabilities" and potential "bias[es]" that may impact their conclusions. 63 F.4th at 246–47. This includes the fact that the Article only reviewed "documented exposures to cosmetic talc" identified in "deposition testimonies" and "interrogatories provided from subjects, parents, and spouses" and limited tissue analyses. ECF No. 1-2 at 3. The Article's "limitations" included that it is "retrospective and uncontrolled," and that "the cases were submitted in medico-legal consultation, all of which potentially introduce bias." *Id.* at 5. The Article further disclosed that the Doctors "testified in asbestos litigation, primarily for plaintiffs." *Id.* at 7.

Nor is this a case of a mixed opinion that is nevertheless verifiable because it "impl[ies] false underlying objective facts." *Pacira*, 63 F.4th at 245; *see also ONY, Inc.*, 720 F.3d at 497 (finding it relevant that plaintiff did not "allege that the data presented in the article were fabricated or fraudulently created). While LTL has tried to plead around *Pacira* and no doubt will argue that the Doctors "fabricated or fraudulently created" the data they considered, *see ONY, Inc.*, 720 F.3d at 497; Compl. ¶ 151, the Complaint contains no plausible factual allegations supporting this theory. Instead, it alleges—at most—that the Doctors misinterpreted data that was considered in connection with the Article, or that LTL claims should have been considered in connection with

the Article. *See* Compl. ¶¶ 66–128 (discussing allegations and evidence presented in the alleged

case matches that it claims the Doctors did not consider). Critically, however, LTL does not allege

that the Doctors falsified any of the interrogatory responses, deposition testimony, or tissue that

the Article considered, which is fatal to its claim. *See* ECF No. 1-2 at 3. LTL's allegations instead

go to the "reliability of the methodology and data" related to a small subset of potential study

subjects, and cannot form the basis of a trade libel claim. *Pacira*, 63 F.4th at 247; *see also* Compl.

¶¶ 66–128. LTL also never alleges that the Article's ultimate conclusion—that "cosmetic talc may

be a cause of malignant mesothelioma" in light of the (long known) fact that "several types of

cosmetic talcum powder products" have been "demonstrated to contain asbestos"—is false, much

less fraudulently contrived. ECF No. 1-2 at 2–3, 7. This speaks volumes.

**Context.** LTL's Complaint fares no better with respect to the statements' context. An

"allegedly defamatory statement must be taken in context and the publication considered as a

whole." *Decker v. Princeton Packet, Inc.*, 561 A.2d 1122, 1125 (N.J. 1989). New Jersey courts

consider the "medium by which the statement is disseminated and the audience to which it is

published." *Pacira*, 63 F.4th at 248. This factor favors dismissal of claims that are premised on

statements that "appear in a peer-reviewed journal . . . directed to the relevant scientific

community," including "specialists in their fields" who are "best positioned to identify opinions

and choose to accept or reject [them] on the basis of an independent evaluation of facts." *Id.*

Here, too, LTL has not carried its burden. The Article was peer-reviewed, and the Journal

subsequently published a letter to the editor criticizing the Article and its conclusions, including

many of the same complaints LTL now raises. *See* Compl. ¶¶ 39–40; ECF No. 1-3. The Doctors

responded to each of these critiques, *see* ECF No. 1-3, while specifically noting that discrepancies

with a small number of cases would not change the "abundance of cases" that still "support [their]

findings." *Id.* The Doctor's statements therefore were made in articles "of an analytical tone and tenor, filled with opinions" such that any "reasonable reader would understand that the articles are scholarly critiques." *NXIVM Corp. v. Sutton*, No. 06 CV 1051 DMC, 2007 WL 1876496, at \*13 (D.N.J. June 27, 2007) (dismissing New Jersey product disparagement claim, where it also "contain[s] disclaimers"); *see also supra* (discussing the Article's disclaimers). LTL's trade libel claim therefore should be dismissed for failure to challenge an actionable false statement of fact.

> 2.  LTL alleges no defamatory statements concerning its products.

Trade libel claims protect corporations only from "harm caused by false statements *about their products*." *New Jersey Auto. Ins. Plan v. Sciarra*, 103 F. Supp. 2d 388, 409 (D.N.J. 1998) (emphasis added) (citing *Dairy Stores Inc. v. Sentinel Pub. Co.*, 516 A.2d 220, 237 (N.J. 1986)); *see also Pacira*, 63 F.4th at 244–45 ("trade libel remedies harm to the reputation of one's property or product"). LTL has not identified *any* statement by any of the Doctors that names LTL, Johnson & Johnson, or any of its products.[15] The Court can and should stop its inquiry there.

It makes no difference that LTL vaguely alleges that the statements at issue were "made of and concerning LTL's products" because the statements "impugned the safety of all cosmetic talc products, including Johnson's Baby Powder and Shower to Shower." Compl. ¶ 152–53; *see also infra* § III.B. (criticizing the lack of factual allegations to support such conclusory allegations made "on information and belief"). These allegations fail, for two reasons. *First*, the allegedly false statements do not disparage the cosmetic talc industry. Instead, LTL's trade libel claim is premised on the allegation that the Doctors falsely stated that all of the study subjects' "only known exposure to asbestos was cosmetic talc," based on its speculation as to (at most) six of the anonymous

---

[15] LTL cannot cure its pleading deficiencies by pointing to a single paper in a footnote that "discusses litigation testing" of J&J's products. Compl. ¶ 154. To find otherwise would lead to absurd and dangerous results, where authors could be targeted for their reliance on *other* academics' statements, buried in footnotes in a peer-reviewed publication.

subjects' identities. *See* Compl. ¶¶ 66–128, 146–47 (focusing on the individuals' alleged alternative

exposures, but not disputing the fact that asbestos has been found in cosmetic talc for decades).

*Second*, even if those statements could somehow be construed as related to the cosmetic talc market

generally, such statements—without any specific attribution to particular products or LTL's

business—cannot form the basis of a trade libel claim as a matter of law. *Albion Eng'g Co. v.*

*Hartford Fire Ins. Co.*, No. 117CV3569, 2018 WL 1469046, at *11 (D.N.J. Mar. 26, 2018), *aff'd*

*sub nom. Albion Eng'g Co v. Hartford Fire Ins. Co*, 779 F. App'x 85 (3d Cir. 2019) ("New Jersey

law is clear that a [product] disparagement claim must include allegations that a statement was

made concerning the complaining party," and collecting cases in support); *cf. Hampden Eng'g*

*Corp. v. Shear Tech., LLC*, No. CV 15-7424, 2016 WL 8677215, at *5 (D.N.J. Aug. 26, 2016)

(dismissing trade libel claim where plaintiff alleged that defendant "made false statements about

its own products" and not plaintiff's products).[16]

### B.  LTL Has Not Alleged The Article Caused Any Special Damages.

LTL's trade libel claim also fails because the Complaint does not allege that any of the

statements at issue caused "special damages." *Pacira*, 63 F.4th at 245 n.8; *see also* Fed. R. Civ. P.

9(g) (special damages "must be specifically pled"). Because LTL has alleged a "general diminution

of business" in the form of lost profits, LTL must allege facts to support it.  *Mayflower Transit,*

*LLC v. Prince*, 314 F. Supp. 2d 362, 378 (D.N.J. 2004). This includes facts "showing an established

---

[16] It also does not matter that other "[v]arious websites"—to which the Doctors did not contribute—"linked the Article" to J&J and its products. Compl. ¶ 155. Third parties' discussion of the Article does not change the fact that the Doctors' statements at issue did not target, much less defame, LTL or its products. If anything, these articles instead reiterate that Johnson & Johnson had already been the target of "successful lawsuits" in connection with "terminal diagnoses" that had already "raised fears among countless people who've used talc-based products throughout the years"—long before the Article was even published. ECF No. 1-8 at 2; *see also* ECF No. 1-9 at 3 (J&J "recalled its popular Baby Powder product due to allegations of asbestos contamination," and was subject to a subsequent "criminal investigation" by the U.S. Justice Department regarding whether "the company misled or lied to the public" about products' safety).

business," the amount of sales for a "substantial period" both "preceding" and "subsequent to the publication, facts showing that such loss in sales were the natural and probable result of such publication," and facts clarifying why LTL cannot identify the "particular customers who withdrew" their business. *Id.*; *see also Bocobo v. Radiology Consultants of S. Jersey, P.A.*, 477 F. App'x 890, 901 (3d Cir. 2012) (no special damages where plaintiff plead "only general losses").

LTL alleges none of this. Instead, LTL vaguely alleges that the March 2020 Article must have caused its unquantified "lost profits on the sale of Johnson's Baby Powder" because the "sales volume and profits from Johnson's Baby Powder declined" at some unspecified point in 2020. Comp. ¶¶ 141, 160. These generalized allegations regarding "lost customers" and "prospective customers" are insufficient as a matter of law. *Sciore*, 2022 WL 950261, at *13 (dismissing trade libel claim for failure to plead special damages). LTL does not allege (i) any customer by name; (ii) the volume of its products' sales before the Article's publication; (iii) the volume of sales after the publication; (iv) the amount that sales or profits declined after the Article's publication; or (v) whether any alleged decline in volume, sales or profits was a departure from pre-existing trends. These omissions are fatal to LTL's claim. *See Mayflower Transit, LLC*, 314 F. Supp. 2d at 378.

Nor is it reasonable to infer that any alleged lost profits or sales were the "natural and direct result" of the Article's publication. *Bocobo*, 477 F. App'x at 901. J&J's press release announcing the discontinuation—which the Complaint selectively quotes, *see* Comp. ¶ 142—suggests that J&J discontinued this product in connection with a review of "approximately 100 SKUs" that were underperforming amid the COVID-19 pandemic. *See supra* n.7 (J&J May 2020 Press Release). The press release's oblique claim that "[d]emand for talc-based Johnson's Baby Powder . . . has been declining" over an unspecified time hardly shows that the Article's publication two months prior caused any such decline. *See Arista Recs., Inc. v. Flea World, Inc.*, 356 F. Supp. 2d 411, 428

(D.N.J. 2005) (generalized allegations that defendants were "damaged" and that statements "curtail[ed] legitimate business is simply not sufficient"); *Nahas v. Shore Med. Ctr.*, No. CIV. 13-6537, 2015 WL 3448021, at *13 (D.N.J. May 29, 2015), *on reconsideration in part,* No. CV 13-6537, 2016 WL 1029362 (D.N.J. Mar. 15, 2016) ("[g]eneralized assertion" that plaintiff was harmed "through the loss of" customers and related revenue is "insufficient" to plead a "general diminution in business"). Rather, the more logical explanation is that LTL's May 2020 product withdrawal was the natural and direct result of (i) the FDA's October 2019 notification of a "voluntary recall" of the product and recommendation that consumers "stop using it immediately and contact [J&J] for a refund"; and/or the (ii) preceding "tidal wave" of well-publicized, record-breaking verdicts levied against J&J in cosmetic talc litigation *See supra*, Background Section.

Finally, LTL cannot cure these deficiencies by claiming additional damages in the form of "increased fees to defend . . . and resolve Talc Claims" and unspecified "expenses incurred to counteract" the Article (i.e., the "costs of this litigation"). Comp. ¶ 168. "[L]egal expenditures to counteract" the statements are not special damages, and cannot support LTL's claim. *Juliano v. ITT Corp.*, No. 90-cv-1575, 1991 WL 10023, at *5–6 (D.N.J. Jan. 22, 1991) (dismissing claim for failure to plead that "as a result of the [publication], others have failed to deal or contract with it").

## IV.    LTL'S FRAUD CLAIM FAILS AS A MATTER OF LAW.

The Court should also dismiss LTL's fraud claim under Rules 9(b) and 12(b)(6) because (i) it targets a nonactionable scientific opinion that is not a material misrepresentation of fact; (ii) does not plausibly allege that the Doctors "intend[ed]" for LTL to rely on the challenged statements, much less any "reasonable reliance" by LTL; and (iii) does not allege any cognizable damages caused by its reliance. *Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 260 (N.J. 2005); *see also Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (Rule 9(b)'s heightened pleading

standard applies to common law fraud claims).

### A. LTL Does Not Allege The Doctors Knowingly Made A False Representation Of Material Fact.

Like its trade libel claim, LTL's fraud claim fails for the threshold reason that it targets non-actionable opinions. *See Johnson v. Draeger Safety Diagnostics, Inc.*, 594 F. App'x 760, 766 (3d Cir. 2014) (opinion regarding scientific reliability of a breathalyzer was not actionable as common-law fraud). For all the reasons discussed above, *supra* § III.A.1, the challenged opinion statements were not "susceptible of exact knowledge when [they] were made," but rather reflect a hotly-debated scientific opinion that is "unsusceptible of proof." *Shtutman v. Carr*, No. A-1064-15T1, 2017 WL 4402045, at *4 (N.J. Super. Ct. App. Div. Oct. 4, 2017); *see also Baughman v. U.S. Liab. Ins. Co.*, 662 F. Supp. 2d 386, 400–01 (D.N.J. 2009) ("fraud cannot be based on a difference of opinion" and the "mere fact that Defendant's opinions were, in large part (but not in total), erroneous does not make them misrepresentations of fact"). The Court can stop here.

LTL also does not allege that the Doctors knowingly made a *material* misrepresentation, which is an independent basis for dismissal. Even accepting at this stage LTL's allegations that each Doctor knowingly made a misstatement with respect to each of the six alleged case matches set forth in the Complaint, such a minor discrepancy—accounting for a small percentage of the 75 reported cases culled from an initial review of 140 subjects—does not amount to a "material misrepresentation."[17] *See Liebler v. LG Elecs., U.S.A., Inc.*, No. 14-CV-03500, 2015 WL 3561590,

---

[17] The Doctors do not concede that *any* of the alleged statements are false. Various pleading deficiencies, however, further impair LTL's attempt to plead materiality. *First*, LTL claims that several of the alleged case matches were erroneously included based on materials that the Doctors disclosed they did not review in connection with the Article. *See* ECF No. 1-2 at 3 (data reviewed limited to interrogatory responses, plaintiff and family deposition testimony, and select tissue analyses). These alleged errors cannot be imputed to the Doctors who did not serve as experts in the alleged case matches. *See* Compl. ¶¶ 111–120 (alleging that Dr. Kradin's expert report in Ms.

at *7 (D.N.J. June 4, 2015) (dismissing common law fraud claim where plaintiff "has not pled facts sufficient to establish" that challenged omissions were "material").

Nor can LTL maintain a fraud claim based on the Doctor's continued refusal to reveal the identities' subjects. Compl. ¶¶ 164, 167. LTL is correct that the identities of the 75 human subjects have never been revealed. In fact, courts confronted with requests for such confidential human subject information routinely rule in favor of safeguarding information concerning research and other medical studies, including the identities of human subjects included in them.[18] This is true not only as a general matter, but also in recent cosmetic talc litigation, where study subjects' identities have been uniformly protected except where the participant was both a party to the litigation and also deceased.[19] The Doctors' good-faith compliance with these underlying ethical

---

B's case showed alternative exposures); *id.* ¶¶ 121–128 (alleging that Ms. H's medical records, which Dr. Maddox was cross examined about at trial, show this alleged case match was wrongly included in the Article). *Second*, LTL also does not allege that any statement with respect to Ms. H, who they allege is Case #75, was false. *Id.* ¶ 110. *Third*, LTL's allegations with respect to Mr. L are implausible on their face because (i) there are differences between Mr. L's case and Case #72, *see id.* ¶ 70 (age at diagnosis and years of use); and (ii) LTL does not allege that any of the Doctors served as an expert in Mr. L's case, despite claiming elsewhere that "at least one" of the Doctors "served as an expert witness" in each of the 75 cases. *See id.* ¶ 31.

[18] *See, e.g., Andrews v. Eli Lilly & Co., Inc.*, 97 F.R.D. 494, 499 (N.D. Ill. 1983) (shielding disclosure of human subjects); *Farnsworth v. Procter & Gamble Co.*, 758 F.2d 1545, 1547 (11th Cir. 1985) (affirming decision to keep medical study participant identities confidential); *Lampshire v. Proctor & Gamble Co.*, 94 F.R.D. 58, 60–61 (N.D. Ga. 1982) (granting protective order over all personal identifying information about participants in CDC study); *Richards of Rockford, Inc. v. Pacific Gas & Elec. Co.*, 71 F.R.D. 388, 389 (N.D. Cal. 1976) (similar).

[19] See *In re Subpoena for Doc. Issued to Peninsula Pathology Associates*, No. 4:22-mc-00001 (E.D. Va. Dec. 8, 2022), ECF No. 8-10 (trial transcript excerpt in *Fisher v. Am. Int'l Indus.*, No. 19070087 (Pa. C.P. Oct. 13, 2022)) (talc case in which court held that identification of a study subject would be inappropriate, even where defendant was attempting to match identity of a subject to a plaintiff in a case in which defendant was named); *Bell v. Am. Int'l Indus*, 627 F. Supp. 3d 520 (M.D.N.C. Sept. 13, 2022) (another talc case protecting anonymity of research subjects with the exception of the individual named plaintiff upon finding that she (1) was a party to the litigation and thus placed her identity in issue and (2) was deceased and thus no longer qualified as a "human subject" under 45 C.F.R. § 46.111(a)(7)); *Peninsula*, No. 4:22-mc-00001 (E.D. Va. Dec. 8, 2022),

guidelines and legal protections cannot give rise to a fraud claim. Even assuming they could, New Jersey's "litigation immunity" provides that "an absolute immunity exists in respect of statements, even those defamatory and malicious," *Hawkins*, 661 A.2d at 288, made in connection with expert testimony. *Ritger v. Gatlin*, No. CIVA 09-2688, 2010 WL 1490582, at *2 (D.N.J. Apr. 13, 2010) (applying the privilege to expert testimony, and collecting cases in support); *Peterson v. HVM LLC*, No. CV 14-1137, 2016 WL 845144, at *10 (D.N.J. Mar. 3, 2016) (collecting cases that "have applied the expansive litigation privilege to claims of fraud"). Nor can generalized allegations of a "duty to disclose" save LTL's claim, as "New Jersey courts will not imply" such a duty absent allegations to show one of "three types of relationships," none of which is alleged here. *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 305 (D.N.J. 2009). It also would not be appropriate to infer a duty to "make a previous statement true." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1185 (3d Cir. 1993). To find otherwise would create an absurd obligation on all academics to disclose every possible mistake or error—no matter how minor—or else be subject to litigation.

### B. LTL Does Not Allege The Doctors Intended For LTL To Rely On The Article, Or That LTL Did In Fact Rely On It To Its Detriment.

LTL's allegations with respect to reliance fail for two independent reasons. *First*, the Complaint does not allege—anywhere—that the Doctors "intended to induce [LTL] to rely on" the challenged statements. *Martin v. DHL Express (USA), Inc.*, 580 F. Supp. 3d 66, 72 (D.N.J. 2022). Instead, the Complaint alleges that the Doctors intended that the statements "be relied upon by others, including the public at large," consumers, unnamed "manufacturers of cosmetic talc products," and others. Compl. ¶ 166. This is insufficient. *See, e.g.*, *Auto. Fin. Corp. v. DZ Motors, LLC*, No. CV167955, 2017 WL 3176275, at *6 (D.N.J. July 26, 2017) (dismissing fraud claim for

---

ECF No. 8-9 (ruling from the bench in *Johnson/Lashley v. Am. Int'l Indus.*, Nos. MID-L-006651-16 and MID-L-007336-16 (N.J. Super. Ct. Law Div. Mar. 11, 2020)) (another talc case refusing to compel discovery of identities of human research subjects).

failure to allege that "Defendants intended Plaintiff to rely on" on the alleged misstatement "as required under New Jersey law"); *Neuss v. Rubi Rose, LLC*, No. CV16-2339, 2017 WL 2367056, at *9 (D.N.J. May 31, 2017) (same). Moreover, it simply is not plausible that the Doctors intended to induce LTL (or J&J)—a company never referenced in the Article, *see supra* § III.A.2, and one that has attempted to discredit the connection between cosmetic talc and cancer for decades—to rely on the Article. *See, e.g.*, *New Skies Satellites, B.V. v. Home2US Commc'ns, Inc.*, 9 F. Supp. 3d 459, 471 (D.N.J. 2014) (dismissing fraud claim as implausible where plaintiff "fail[ed] to set forth facts showing that [defendant] intended for [plaintiff] to rely upon its alleged misrepresentations").

*Second*, LTL does not plausibly allege that it relied on the Doctors' statements, or that this reliance was "reasonable." *Banco Popular N. Am.*, 876 A.2d at 260. LTL claims it "made its business decisions and defense of Talc Claims . . . in reasonable and justifiable reliance" on the Doctors' statements. Compl. ¶ 167. In other words, LTL claims that it somehow relied on the Doctors' statements that they examined 75 anonymous study subjects whose "only known exposure to asbestos was cosmetic talc" to inform its business decisions and litigation defense. But it is wholly implausible that LTL relied on these underlying statements regarding the study's methodology to independently inform its defense of Talc Claims—litigation that it undeniably had an independent motivation to vigorously defend against.

Nor is there any basis to believe that LTL reasonably relied on these statements given J&J's decades-long insistence that its cosmetic talc products are safe, do not contain asbestos, and do not cause cancer. *See, e.g.*, *supra* Background Section; ECF No. 1-7 at 4 (nothing that J&J "has disputed" the FDA's finding of asbestos in J&J Baby Powder, "insisting that its product is safe and asbestos-free"). Instead, the fact that LTL, J&J, and its counsel have for years "investigate[d] the relevant state of facts" for itself—specifically the link between cosmetic talc and mesothelioma—

precludes a finding of reasonable reliance. *DSK Enterprises, Inc. v. United Jersey Bank*, 459 A.2d 1201, 1206 (N.J. Super. Ct. App. Div. 1983) (affirming judgment for defendant on fraud claim where plaintiff conducted its "own investigation" and was therefore "charged with knowledge of whatever he could have discovered by a reasonable investigation"); *Dare Invs., LLC v. Chicago Title Ins. Co.*, No. CIV. 10-6088, 2011 WL 2600594, at *7 (D.N.J. June 29, 2011) (finding plaintiff's "arguments in support of reasonable reliance" were "factually contradicted by the record, which clearly indicates that [plaintiff], through its attorneys, investigated" the alleged misstatement); *Voilas v. Gen. Motors Corp.*, 170 F.3d 367, 377 (3d Cir. 1999) ("reasonable reliance" is judged against an "objective standard, and, possibly, some measure of a duty to investigate"); Compl ¶ 143 (LTL and its attorneys have "investigate[d]" the statements at issue).

### C.  LTL Does Not Allege Damages Caused By Its Alleged Reliance.

LTL also cannot show damages caused by its reliance on the alleged misrepresentations. *First*, because LTL has not adequately alleged reliance, it necessarily follows that LTL also has not alleged that it "suffered damage as a result of [its] reliance." *Martin*, 580 F. Supp. 3d at 73. *Second*, even assuming this were not the case, it has not alleged any injuries proximately caused by such reliance. This inquiry uses a "combination of logic, common sense, justice, policy and precedent" to "fix[] a point in a chain of events . . . beyond which the law will bar recovery." *New Jersey Carpenters Health Fund v. Philip Morris, Inc.*, 17 F. Supp. 2d 324, 330 (D.N.J. 1998) (dismissing fraud claim for lack of proximate cause). Multiple events that both preceded (blockbuster verdicts and an FDA recall) and followed the Article (J&J's voluntary discontinuation), *see supra* § I, make it implausible that the Article could be a "substantial contributing factor" to LTL's alleged damages. *McCabe v. Ernst & Young, LLP.*, 494 F.3d 418, 438 (3d Cir. 2007).

## V.       LTL'S LANHAM ACT CLAIM FAILS AS A MATTER OF LAW.

LTL's Lanham Act claim likewise fails as a matter of law, for three reasons: (i) the focus of LTL's claim—a peer-reviewed study published in a medical journal—is protected noncommercial speech beyond the Lanham's Act reach; (ii) LTL lacks statutory standing to sue under the Act; and (iii) LTL has not plausibly pled core elements of its claim.

### A.  LTL Alleges No "Commercial Advertising" By The Doctors.

LTL's Lanham Act claim fails for the threshold reason that it does not target any commercial speech. *See Farah v. Esquire Mag.*, 736 F.3d 528, 541 (D.C. Cir. 2013) ("[E]very circuit court of appeals to address the scope of [Lanham Act claims for false advertising and false association] has held that they apply only to commercial speech."); *IDT Telecom, Inc. v. CVT Prepaid Sols., Inc.*, No. CIV.A. 07-1076, 2009 WL 5205968, at *8 (D.N.J. Dec. 28, 2009) ("Lanham Act only" targets "false 'commercial advertising.'") (quoting 15 U.S.C. § 1125(a)(1)).[20] Commercial speech "does no more than propose a commercial transaction." *See Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 66 (1983) (cleaned up). Courts in this Circuit consider three factors to assess whether speech is commercial: "(1) is the speech an advertisement; (2) does [it] refer to a specific product or service; and (3) does the speaker have an economic motivation for the speech." *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 933 (3d Cir. 1990). While satisfying these factors lends "strong support for the conclusion that the speech is commercial," it is not dispositive; rather, courts must "mak[e] a commonsense distinction between

---

[20] *See also Peterka v. Setter*, No. 2-18-CV-1177, 2020 WL 12604754, at *6 (W.D. Pa. Feb. 5, 2020) ("While the Third Circuit has not explicitly held that the Lanham Act only applies to commercial speech, district courts within the Third Circuit and the parties in this case agree that the Lanham Act is limited to commercial speech."); *Cornette v. Graver*, 473 F. Supp. 3d 437, 459 (W.D. Pa. 2020) ("Courts construe the Lanham Act narrowly to avoid conflicts with the First Amendment . . . to avoid this conflict, the Lanham Act regulates only commercial speech, which receives lesser protection under the First Amendment than more traditional means of expression.").

speech proposing a commercial transaction . . . and other varieties of speech." *Facenda v. N.F.L.*

*Films, Inc.*, 542 F.3d 1007, 1017 (3d Cir. 2008). Courts also must "err on the side" of protecting

speech that is "near the line dividing commercial and noncommercial speech." *Konowicz v. Carr*,

838 F. App'x 1, 8 (3d Cir. 2020) (internal quotation marks and citations omitted).

Here, LTL's attempt to plead commercial speech is contained in a single sentence stating

that "[t]he Authors' statements and omissions were made in commercial advertising." Compl. ¶

174. But the Complaint contains no facts supporting this conclusory allegation, and the Court need

not accept it. *See Baraka v. McGreevey,* 481 F.3d 187, 195 (3d Cir. 2007) (courts need not accept

a "legal conclusion couched as factual allegation"); *Iqbal,* 556 U.S. at 678 ("Threadbare recitals

of the elements of a cause of action . . . will not suffice."). LTL does not even specify which

statements supposedly violated the Lanham Act. LTL instead vaguely alludes to statements "set

forth above." *See* Compl. ¶¶ 170–171. In the preceding 169 paragraphs, LTL alleges just three

statements made by the Doctors: (i) the Article and Letter; (ii) an interview with Dr. Emory

published online in March 2020, *id.* ¶ 43; and (iii) expert witness testimony by the Doctors, *id.* ¶¶

53–54, 57.[21] None of these satisfies the operative *U.S. Healthcare, Inc.* test.[22]

**The Article and Letter.** A plain reading of the Article and Letter demonstrates that neither

is not commercial speech. To start, neither "refer[s] to a specific product or service nor do[es it]

propose a commercial transaction." *Konowicz v. Carr*, No. CV15-6913, 2019 WL 13402859, at

---

[21] Every other statement alleged in the Complaint was made and disseminated by a third party, *see id.* ¶¶ 44–52, 55–56, 58–64, and therefore cannot support a Lanham Act claim against the Doctors. *See Newborn Bros. Co. v. Albion Eng'g Co.*, 481 F. Supp. 3d 312, 344–45 (D.N.J. 2020) (to be actionable under Lanham Act, "statements must be made by the defendant") (citations omitted).

[22] Courts "review each statement separately" to determine Lanham Act actionability. *Trex Co., Inc. v. CPG Int'l LLC*, No. 5:17-CV-00005, 2017 WL 3272013, at *5 (W.D. Va. Aug. 1, 2017). *See also Newborn Bros. Co.* 481 F. Supp. 3d at 344 (plaintiff cannot "'mix and match statements, with some satisfying one Lanham Act element and some satisfying others'") (citation omitted).

*15 (D.N.J. May 31, 2019). Each is instead an academic publication in a medical journal to an audience comprised of doctors and scientists—not consumers of talc products. And while LTL baldly asserts that Defendants' statements "disparage and misrepresent the nature, characteristics, and qualities of Johnson's Baby Powder and Shower to Shower," Compl. ¶¶ 170–171, it alleges no facts supporting this conclusory allegation, which on its face is implausible given that the Article never references J&J nor its products. The Court can stop there.

What is obvious from the face of the Article and Letter is buttressed by "an abundance of case law to support the proposition that a scientific article is protected noncommercial speech[.]" *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 456 (D.N.J. 2009) (collecting cases and dismissing Lanham Act claim based on publication of medical article in peer-reviewed journal). *See also generally Bd. of Trustees of Leland Stanford Jr. Univ. v. Sullivan*, 773 F. Supp. 472, 474 (D.D.C. 1991) ("[T]he First Amendment protects scientific expression and debate just as it protects political and artistic expression."). The Article was made in a "publication[] directed to the relevant scientific community," *ONY, Inc.*, 720 F.3d at 496–97, "distributed by an impartial educational journal in the field of medicine," and does "not advocate that the reader purchase one product over another," *Bracco Diagnostics*, 627 F. Supp. 2d at 457.[23] "[C]ourts are ill-equipped to undertake to referee such controversies. Instead, the trial of ideas plays out in the pages of peer-reviewed journals, and the scientific public sits as the jury." *ONY, Inc.*, 720 F.3d at 497. *See also Bracco Diagnostics*, 627 F. Supp. 2d at 457 (finding it inappropriate "to 'inquire into the validity of . . . scientific theories[] . . . promulgated in scientific journals," and "recogniz[ing] the myriad of problems that might ensue from judicial forays into the field of

---

[23] LTL likewise fails to allege that the Article (or any other statement by the Doctors) was "sufficiently disseminated" to the relevant purchasing public. *Wakefern Food Corp. v. Marchese*, No. 2:20-CV-15949-WJM-MF, 2021 WL 3783259, at *5 (D.N.J. Aug. 26, 2021).

scientific research and publication"); *Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 624 (7th Cir. 2005) ("scientific disputes must be resolved by scientific means," not federal courts).

**MedicalResearch.com Interview**. Dr. Emory's alleged "republic[ation]" of the claims made within the Article in a MedicalResearch.com interview, Compl. ¶ 43, also is not commercial advertising. The interview does not refer to any specific brand or product, nor propose any commercial transaction. *Konowicz,* 2019 WL 13402859, at *15; ECF No. 1-4. It instead is devoted entirely to summarizing the Article's conclusions, with a disclaimer that: "*The information on MedicalResearch.com is provided for educational purposes only*." ECF No. 1-4 at 3.

**Expert Witness Testimony**. Nor can the Doctors' expert witness testimony in cosmetic talc/mesothelioma lawsuits, Compl. ¶¶ 53–54 & 57, be deemed commercial advertising. "[T]he fact that one is paid to be an expert witness, does not make his testimony commercial speech." *Hoover v. Morales*, 164 F.3d 221, 225 (5th Cir. 1998) (citing *Central Hudson Gas & Elec. Corp. v. Public Service Commission*, 447 U.S. 557, 561 (1980)). *See also Bolger,* 463 U.S. at 67 (economic motivation for speech "clearly insufficient to turn [it] into commercial speech"); *Riley v. Nat'l Fed'n. of the Blind of N.C., Inc.*, 487 U.S. 781, 801 (1988) ("a speaker is no less a speaker because he or she is paid to speak.").[24]

### B. LTL Lacks Statutory Standing.

LTL's Lanham Act claim also must be dismissed because LTL has failed to plead that it suffered losses proximately caused by the Article's publication. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129–32 (2014) (to have standing, Lanham Act plaintiff

---

[24] *See also Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1541 (S.D.N.Y. 1994) ("The fact that [defendants] stood to benefit from" a publication, "even that they *intended* to benefit" is insufficient to manufacture commercial speech); *Hoover*, 164 F.3d at 225 ("If all it takes to make speech commercial is that the speaker is paid to say it, then every writer with a book deal, every radio D.J., and every newspaper and television reporter is engaged in" it).

must fall within zone of interest protected by the statute and injuries must be proximately caused by violation of the statute). As with its trade libel and fraud claims, LTL's burden to show that the statements at issue proximately caused its injuries is heavier than that with respect to Article III. *See, e.g.*, *Finkelman v. Nat'l Football League*, 810 F.3d 187, 193–94 (3d Cir. 2016). To allege proximate causation, LTL "must show economic or reputational injury *flowing directly from the deception wrought by the defendant's advertising*." *Lexmark*, 572 U.S. at 133. In "the classic Lanham Act false-advertising claim," where "one competitor directly injures another by making false statements about his own goods or the competitor's goods and thus induc[es] customers to switch," the harm is "attributable to," and thus proximately caused by, the defendant's conduct. *Id.* at 137, 140. On the other hand, "where the causal chain . . . is not direct, but includes the intervening link of injury" to another actor, the indirect victim must show that the injury "follow[s] more or less automatically" from the harm suffered by the third-party. *Id.* at 139–40.

Just as LTL cannot allege Article III standing, LTL does not come close to carrying its more onerous burden here. As shown above, LTL has not pled facts demonstrating that it lost sales as a direct result of the Doctors' statements, as opposed to the many other factors that may have impacted its sale of talc products, such as negative publicity through lawsuits, exposés by Reuters and the New York Times, and the FDA recall. That is dispositive. *See, e.g.*, *ThermoLife Int'l, LLC v. Am. Fitness Wholesalers, L.L.C.*, 831 F. App'x 325, 325–26 (9th Cir. 2020) (affirming dismissal for lack of proximate cause where plaintiff "offer[ed] only conclusory allegations and fail[ed] to plausibly connect" declining sales to the alleged advertising); *Wall & Assocs., Inc. v. Better Bus. Bureau of Cent. Va., Inc.*, 685 F. App'x 277, 279 (4th Cir. 2017) (affirming dismissal on proximate cause grounds where plaintiff did "not identify a single consumer who withheld or cancelled business with it or pointed to a particular quantum of diverted sales or loss of goodwill and

33

reputation resulting directly from reliance on any false or misleading representations").

### C. LTL Fails To Plead Core Elements Of Its Lanham Act Claim.

LTL's failures to plead commercial speech and proximate causation provide two independent bases for dismissal. But the Lanham Act claim should be dismissed for the additional reason that LTL has not plausibly alleged several core elements of its claim: (1) the Doctors "made false or misleading statements as to [their] own product or another's"; (2) "there is actual deception or at least a tendency to deceive a substantial portion of the intended audience"; (3) "the deception is material in that it is likely to influence purchasing decisions"; or (4) "there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc." *Ditri v. Coldwell Banker Residential Affiliates, Inc.*, 954 F.2d 869, 872 (3d Cir. 1992) (citations omitted, cleaned up).

> #### 1. None of the alleged statements is a false or misleading statement of fact about LTL's product(s) or the Doctors' services.

LTL fails to allege any false or misleading statement or omission of fact—let alone one about an LTL product or their own services—and thus fails to plead the first element of its claim. Start with the requirement that the false or misleading statement be one "of fact." *EP Henry Corp. v. Cambridge Pavers, Inc.,* 383 F. Supp. 3d 343, 349 (D.N.J. 2019). As explained above, the statements alleged are non-actionable opinions. *See supra* § III.A.1. The alleged statements also are not about LTL's "own product or another's." *See supra* § III.A.2 (discussing similar deficiency under LTL's trade libel claim); Compl. ¶¶ 170–171 (baldly alleging the Article disparages LTL and its products). LTL's theory is instead that any statement about cosmetic talc generally *must* be interpreted as disparaging J&J and its products. This is absurd. Under this theory, any oil producer with robust market share could sue the author of an article published in a scientific journal about the likely causes of climate change, large-scale ranchers could sue the author of an article in a medical journal about heart disease, and so on. That is not the law, and the Court should tread

cautiously atop that slippery slope. LTL alternatively contends that the supposedly false statements pertained to the "services of the Authors," Compl. ¶¶ 170–171, 174. But the Complaint is devoid of any statement by the Doctors *about their "services as expert witnesses*," which is dispositive.

### 2. LTL fails to plausibly plead material deception.

LTL also has not plausibly pled that the Doctors' statements caused "actual deception or at least a tendency to deceive a substantial portion of the intended audience" or that the alleged deception was "material"—*i.e.*, "likely to influence purchasing decisions." *Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 248 (3d Cir. 2011). LTL's allegations concerning these elements underscore just how incongruous its theory is with the Lanham Act. Starting with the first factor, LTL contends that the Doctors' statements are "literally false," such that deception can be presumed. But to meet this standard, a Lanham Act plaintiff must plead "*an advertisement*" that is "unambiguous and literally false." *Steeplechase Arts & Prods., L.L.C. v. Wisdom Paths, Inc.*, No. CV2202031, 2023 WL 416080, at *5 (D.N.J. Jan. 26, 2023) (emphasis added); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002) ("In analyzing whether *an advertisement or product name* is literally false, a court must determine, first, the unambiguous claims *made by the advertisement or product name*") (emphasis added).[25] As explained above, LTL has not alleged any "advertisement" by the Doctors, *supra* § V.A., so as a matter of law cannot satisfy this element.

"In the alternative," LTL alleges that "the Authors' statements have actually deceived, or have the tendency to deceive, a substantial portion of the intended audience." Compl. ¶ 172. But the Court need not accept this bare recitation of the claim's element, *Baraka*, 481 F.3d at 195;

---

[25] *See also, e.g.*, *Rockwell Automation, Inc. v. Radwell Int'l, Inc.*, No. CV 15-5246, 2016 WL 7018531, at *5 (D.N.J. Nov. 30, 2016) ("plaintiff need not prove actual consumer deception if *the advertisement* is literally false") (emphasis added).

*Iqbal*, 556 U.S. at 679, because LTL never pleads that consumers were "the intended audience" for any statement at issue. Nor could it: the audience for these statements were doctors and scientists (the Article) and parties to legal proceedings (expert testimony). Even accepting LTL's allegation that Article excerpts eventually trickled into the public domain via third party statements and conduct, that does not somehow render consumers the *Doctors'* "intended audience" at the time the statements were made. For similar reasons, LTL's single-sentence effort to plead that deception was "material to purchasing decisions," *see* Compl. ¶ 173, must fail. There is no connective tissue between the Doctors' statements in a medical journal or expert witness testimony and consumers' purchasing decisions, nor is such a theory temporally plausible. *See supra* § I.

   3.   LTL fails to plausibly plead likelihood of injury.

   For the same reasons LTL has failed to plausibly plead Article III or statutory standing, LTL also has not plausibly alleged "a likelihood of injury . . . in terms of declining sales, loss of good will, etc." *Ditri*, 954 F.2d at 872. The Complaint is devoid of allegations concerning what lost sales or lost customers could be attributed to the Doctor's alleged conduct, and thus must be dismissed.[26] *Brittle v. Warner Bros. Ent.*, No. 3:16-CV-00908-JAG, 2017 WL 11503437, at *3 (E.D. Va. Aug. 28, 2017) (dismissing Lanham Act claim for failure to assert injury).

   **D.  The Doctors Are Entitled To Recover Attorneys' Fees And Costs For Having To Defend LTL's Frivolous Lanham Act Claim.**

   The Lanham Act permits an award of attorneys' fees to the prevailing party in "exceptional cases." 15 U.S.C. § 1117(a); 35 U.S.C. § 285. "[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering

---

[26] LTL also alleges that the statements at issue "resulted in the unjust enrichment of the Authors." Compl. ¶ 176. This is frivolous, and conflicts with New Jersey's requirement that a plaintiff "conferred a direct benefit on the defendant" to allege an unjust enrichment claim. *Montich v. Miele USA, Inc.*, 849 F. Supp. 2d 439, 459 (D.N.J. 2012). LTL has not made this showing.

both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). *See also Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 314 (3d Cir. 2014) (explaining that *Octane Fitness* "embrac[ed]" an "expansive" definition of "exceptional," which does not require bad faith or culpability); *see also id.* at 315 (discretion to award fees does not require "that the losing party acted culpably").[27] Thus, "'a case presenting . . . exceptionally meritless claims may" alone be sufficient to "warrant a fee award.'" *Id.* at 314 (quoting *Octane Fitness*, 572 U.S. at 555).

As described above, LTL's Lanham Act claim is patently frivolous.[28] *See supra* § V.A-C. That is a sufficient basis to award fees. *See, e.g.*, Order at 11, *Fair Wind Sailing v. Dempster, et al.*, No. 2011-cv-55 (D.V.I. Mar. 16, 2016), ECF No. 100 ("Where, as here, a plaintiff's claim is so lacking in merit, it is appropriately categorized as exceptional for Lanham Act purposes."); *Allegheny Coupling Co. v. Betts Indus., Inc.*, No. CA 06-76, 2011 WL 1230151, at *8 (W.D. Pa. Mar. 31, 2011) (granting fees and collecting cases showing that "[d]istrict courts have not hesitated to award attorney fees under the Lanham Act when a defendant is forced to defend against a frivolous" claim).[29] Moreover, while not necessary to support a finding that this case is "exceptional," LTL's impetus for filing its Lanham Act claim further supports an award of fees.

---

[27] The Third Circuit explained in *Fair Wind Sailing* that "[w]hile *Octane Fitness* directly concerns the scope of a district court's discretion to award fees for 'exceptional' case[s] under § 285 of the Patent Act, the case controls our interpretation of § 35(a) of the Lanham Act." 764 F.3d at 315.

[28] That LTL also elected to sue the Doctors in New Jersey despite their lack of contacts with the State both underscores the baselessness of its complaint and compounds the burden on the Doctors, who have been forced to defend this frivolous and harassing lawsuit far from their home forums.

[29] *See also, e.g.*, *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 990 (9th Cir. 2008) ("Exceptional circumstances can be found when the non-prevailing party's case is groundless, unreasonable, vexatious, or pursued in bad faith."); *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1156 (9th Cir. 2002) (affirming fee award when trademark claim was "groundless and unreasonable because it had no legal basis"); *Yankee Candle Co. v. Bridgewater Candle Co.*, 140 F.Supp.2d 111, 121–22 (D. Mass. 2001) (awarding fees based on plaintiff's "pursuit of unfounded claims").

What's past is prologue, and J&J's history of harassing and attempting to silence so-called "antagonistic personalities" like the Doctors, *see supra* Background Section, suggests LTL's true motivation here. The frivolity of the Complaint further supports that inference; given that LTL plainly had no plausible hope of recovery on its Lanham Act claim, it stands to reason it filed the claim to intimidate, harass, and chill the speech of doctors whose research LTL disagrees with.

## CONCLUSION

For the foregoing reasons, Defendants request that the Court grant its motion to dismiss Plaintiff's claims with prejudice.

Dated: Friday, September 15, 2023

Respectfully submitted,
SHERMAN, SILVERSTEIN, KOHL,
ROSE & PODOLSKY, P.A.

By:   /s/ Bruce S. Luckman
Bruce S. Luckman
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Telephone: 856-662-0700
Facsimile: 856-488-4744

ALI & LOCKWOOD LLP
Kathryn M. Ali (admitted *pro hac vice*)
Elizabeth C. Lockwood (admitted *pro hac vice*)
300 New Jersey Avenue NW, Suite 900
Washington, D.C. 20001
Telephone: 202-651-2476
katie.ali@alilockwood.com
liz.lockwood@alilockwood.com

*Attorney for Defendants*